**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LENTUCKY**
**CENTRAL DIVISION AT LEXINGTON**
**CIVIL ACTION NO. 5:21-cv-00156-DCR**

**JERVIS MIDDLETON**                                                          **PLAINTIFF**

**v.**                            **MEMORANDUM IN SUPPORT OF**
                                  **MOTION FOR SUMMARY JUDGMENT**

**LEXINGTON-FAYETTE URBAN COUNTY GOVERNMENT**
**D/B/A LEXINGTON POLICE DEPARTMENT, et al.**                     **DEFENDANTS**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Defendants Lexington-Fayette Urban County Government d/b/a Lexington Police Department, Chief Lawrence Weathers, in his individual capacity, by and through counsel, and respectfully submit the following:

**INTRODUCTION**

Defendant Lexington-Fayette Urban County Government (LFUCG) previously employed Plaintiff Jervis Middleton at the Lexington Police Department (LPD) from 2007 to 2021. Middleton's termination spurred two separate actions. The first action was an appeal pursuant to KRS 15.520(8) from police disciplinary proceedings conducted under that statute. No. 21-CI-00873 (Fayette Circuit Court). This civil lawsuit is the second action that he has filed.

Middleton's amended civil complaint asserts six counts. Five counts are against LFUCG that include: three KRS 344.040 claims alleging race-based hostile work environment, disparate treatment, disparate impact; one KRS 344.280 retaliation claim; and one breach of contract claim based on the KRS Chapter 67A collective bargaining agreement (CBA) with LFUCG. Only one count is against Lexington Police Chief Lawrence Weathers individually alleging First Amendment free speech retaliation actionable pursuant 42 U.S.C. § 1983.

1

For each claim, there are sufficient undisputed facts to defeat liability on one or more grounds to entitle LFUCG and Chief Weathers to summary judgment. Any points of dispute in this case are immaterial for summary judgment purposes.

## STATEMENT OF THE CASE

Middleton once enjoyed a very promising law enforcement career at LPD. He had filled many special roles and was promoted to sergeant. First Am. Compl. ¶ 9 (DE 1-1). An assignment to the Chief's Office after promoting to sergeant to serve as the agency's Public Information Officer (PIO) was especially high profile. *Id.*; Middleton Dep. 139:3 to 139:7. The PIO position made Middleton the "face of the agency." *Id.* 337:7 to 337:8.[1]

Personal and professional troubles loomed, however. Middleton had been having an affair with Heidi Hillard for approximately two years while married to Kristi Middleton. His separate relationships with Kristi and Heidi both started to falter in mid-2018. Although Middleton had hidden the affair from Kristi, they had started taking steps in June or July to separate, including Middleton living in a separate apartment. K. Middleton Dep. 30:16 to 31:22. Heidi parted ways with Middleton on July 30 and was already seeing another man.

During the early morning hours of August 3, Heidi twice contacted police regarding an incident at her home. Her first call requested an additional patrol after seeing a male subject on her garage roof looking into a home window. Heidi soon made a second call requesting to make a report. The responding officer spoke to Heidi and her new boyfriend who had been there with her. They described seeing a black male on the garage roof and believed he had fled in a black SUV possibly resembling a Ford Explorer. Baker KYIBRS Report p. 4 (Ex. 1).

Heidi suspected Middleton was the man spotted on the garage roof. In addition to contacting police, Heidi separately texted Middleton demanding him to "confirm it was you."

---

[1] Transcripts from cited depositions and Middleton's disciplinary hearing to be separately filed due to size.

Middleton feigned ignorance. He claimed he had "company," responded "WTF," and asked if she was "drunk." Hillard-Middleton Texts (Ex. 2). Middleton traveled to Heidi's home after the text exchanges while police were still on scene. When police told Middleton about Heidi's accusations, Middleton reportedly "replied he had proof that he was at his residence … with a friend." Baker KYIBRS Report pp. 4-5 (Ex. 1). An officer escorted Middleton back to his residence while another officer stayed on scene with Heidi. She described her past relationship with Middleton and reported her suspicions that Middleton had been following her. Before any investigation into Middleton, Heidi told police she believed Middleton had learned information about her new boyfriend and another past associate from running their license plates. *Id*. p. 5. The offenses listed on the officer's completed report included harassment and criminal trespassing. Middleton was the only identified suspect. *Id*. pp. 1-2.

The ensuing criminal investigation was assigned to Lt. Albert Johnson on the morning of August 3. After reviewing the initial information, Lt. Johnson arranged to meet and speak with Heidi in person that day. She again described her interactions with Middleton and suspicions that he had been "stalking" her. Based on the information, Lt. Johnson confirmed license plate information and checked it with LPD's system. He quickly learned two law enforcement personnel—Sgt. Gary Thurman and Officer Travis Beatty—had run her new boyfriend's plate number on July 27 and July 30, respectively. Johnson KYIBRS Report p. 7 (Ex. 3). Lt. Johnson met separately with Thurman and Beatty on August 7. They both confirmed Middleton had requested them to run the plates as well as drive by a residence matching Heidi's address. Middleton had not explained the basis for the requests to them and they both assumed it was for legitimate law enforcement purposes. In one text exchange with Beatty, Middleton explained

"def donf [sic] get out on the radio," "just doing some covert shit," and "go solo." *See id.* p. 8; Beatty-Middleton Text (Ex. 4).

Additional officers voluntarily came forward reporting similar interactions with Middleton after Lt. Johnson had spoken with Thurman and Beatty. Lt. Johnson observed "word had circulated through the department regarding the questions I was asking." His investigation ultimately identified 13 law enforcement personnel who Middleton requested to either drive by Heidi's residence or run information on persons associated with her. Lt. Johnson determined that the investigation had substantiated Heidi's suspicions that Middleton was running plates. He reviewed his investigation with his superiors and then met with the County Attorney's office. After presenting the investigation there, Second Degree Official Misconduct was identified as the appropriate charge. No charges for harassment or criminal trespassing were pursued. Johnson KYIBRS Report p. 8; 8/14/2018 Criminal Complaint (Ex. 5). The ensuing prosecution proceeded to trial and Middleton was acquitted.

Once the criminal prosecution ended, a formal complaint was filed to initiate an internal administrative investigation of Middleton. 2/11/19 Formal Complaint (Ex. 6). The formal complaint focused on Middleton using other officers to patrol Heidi's residence and run license plate numbers to provide him information on persons associated with her. If substantiated, the formal complaint indicated violation of LDP's Misconduct policy by bringing discredit upon himself and agency as well as from impairing the operation and efficiency of the department and individual officers. Internal administrative investigations are conducted by LPD's Public Integrity Unit (PIU). Middleton's PIU investigation was assigned to PIU Lt. Tommy Perkins.

Although Middleton's PIU and criminal investigations involved related subject matter, the standards that governed were different. While the prosecution involved criminal culpability,

4

the PIU investigation only examined whether Middleton had violated policy. The highest "proof beyond a reasonable doubt" burden to criminally convict also is inapplicable to administrative actions. Middleton's criminal prosecution was additionally subject to his constitutional rights from self-incrimination and to remain silent, which he exercised by not testifying at trial. Middleton Dep. 183:14 to 183:16. Yet, those constitutional protections do not extend to administrative PIU investigations. *See*, *e.g.*, *Garrity v. New Jersey*, 385 U.S. 493 (1967).

Middleton accordingly was interviewed as part of the PIU investigation. The interview was extensive, and most of questioning focused on the patrols and information that Middleton had requested other officers to pursue for him. Middleton tried to downplay his activities as "nosey" and suggested it served legitimate law enforcement purposes to protect Heidi and himself from her ex-husband. 4/8/19 Perkins Memo (Ex. 7) (summarizing Middleton interview on LEXINGTON 14 to LEXINGTON 19). In addition to the interview, Middleton had been originally requested to prepare a memorandum regarding the August 3 incident at Heidi's home, which was pursuant to KRS 15.520(5)(d) and was included as part of the PIU investigation. *Id.* (summarized on LEXINGTON 13). His memo admits visiting "Heidi's house" early on August 3, 2018 where he "peered inside to see if she was there," which his memo described as "poor judgment." It also proved his communications with Heidi and police on the night of the incident were untruthful by indicating to them he had not been at her home. His memo explained he "denied it to [Heidi] out of embarrassment" and "did not openly confirm with [police] that [he] had been there out of embarrassment of the affair." *Id.* (attaching memo on LEXINGTON 42 to LEXINGTON 43).[2]

---

[2] Middleton's memo claimed he "drove to Heidi's to talk through the things going on in my life" and explained "she had always been there to listen no matter what." Yet, in the last text exchange between Middleton and Heidi prior to August 3, he had requested to "stop by for a few," which she declined, indicating "I think we need to spend time away from each other." Hillard-Middleton Texts (Ex. 2). The explanation in Middleton's memo for his early

Lt. Perkins built on the evidence from Lt. Johnson's criminal investigation and conducted follow-up interviews with witnesses. *Id.* (summarizing evidence on LEXINGTON 12 to LEXINGTON 13). In addition to refencing Middleton's "covert shit" text exchange with Beatty, his final report additionally highlighted an exchange with Officer Rebecca Saylor because she explicitly questioned Middleton's request to run plate information for him, which he falsely said related to suspicious activity in his mother's neighborhood. *Id.* (on LEXINGTON 12); Middleton-Saylor Text (Ex. 8). The officers interviewed by PIU variously questioned Middleton's trustworthiness, expressed feeling mislead by him, and indicated Middleton had abused his position as a supervisor, particularly given his assignment within the Chief's Office. 4/8/19 Perkins Memo (Ex. 7) (summarizing interviews collectively on LEXINGTON 13 and individually on LEXINGTON 25 to LEXINGTON 36).

Final PIU reports go directly to Chief Weathers for review. In this case, the matter proceeded to the next step with Chief Weathers making referral to the Disciplinary Review Board (DRB) for recommendation. The DRB recommended termination. Under the next step, the matter returned to Chief Weathers for final recommendation. He proposed demotion and three-months suspension without pay. Although Chief Weather's proposal was more lenient than the DRB's termination recommendation, Middleton rejected it. Referral to LFUCG's law department to prepare charges for hearing before LFUCG's council was the last remaining step. First Recommendation Form (Ex. 9).

As Middleton's disciplinary action was unfolding, the local union filed a grievance on Middleton's behalf under the CBA. Grievance Form (Ex. 10). The grievance was dense and largely targeted alleged noncompliance with procedural rights and protections under union and

---

morning, unannounced visit to Heidi's home on August 3 seems dubious considering the last communications they had. His memo invoked *Garrity* and had to be excluded from the criminal investigation and prosecution.

statutory police disciplinary laws. At the very end, however, the grievance described Middleton's discipline as disproportionately severe and discriminatory based on his race. *Id*. p. 5. Under the grievance procedure, Middleton, his counsel, and an FOP representative met with his immediate supervisor, Chief Weathers, and then LFUCG HR Director John Maxell. Middleton Dep. 219:2 to 221:1 (describing grievance process).

Middleton's disciplinary hearing before council was scheduled for October 24, 2018. On the day of the hearing, Middleton and his attorney resumed negotiations and reached an agreement with Chief Weathers on behalf of LFUCG. Settlement Documents (Ex. 11). LFUCG memorializes settled disciplinary actions and documents the associated terms on a standardized form labeled "AGREEMENT OF CONFORMITY WITH KRS 95.450 AND RELEASE." In Middleton's case, the parties additionally executed a supplemental "Discipline Resolution Agreement" in conjunction with the standard settlement documentation.

Middleton's agreed upon discipline was demotion. The settlement terms guaranteed Middleton's right to participate in the next promotion cycle and the applicable selection criteria. Chief Weathers had to drop the three-month unpaid suspension that he originally recommended to make Middleton eligible for the next promotion cycle, which was another concession benefiting Middleton. Middleton Dep. 227:6 to 227:18 & 234:2: 234:18. The concessions that Middleton made under the settlement terms included releasing any claims relating to his discipline and the underlying investigation or disciplinary process. In addition, the settlement terms provided that the union grievance on Middleton's behalf was "resolved," "withdrawn," and that "no further action is necessary or will be taken, which Middleton knew included the "whole grievance," including the alleged racial discrimination. Settlement Documents (on LEXINGTON 4961 ¶ 5); Middleton Dep. 230:5 to 230:15 & 230:25 to 231:7. Middleton further confirms there

was no discussion or expectation to continue with any separate HR race investigation. *Id*. 223:1 to 223:5 ("Q: And you didn't -- at least in as far as it pertained to your discipline when you dropped the union grievance, you didn't explore or talk about continuing on with the race discrimination side of it through HR? A: Through HR?  No.  No, sir.").

Despite the settlement agreement, Middleton and his wife discussed his dissatisfaction "from never getting my point, my side" across to Chief Weathers. His wife volunteered to reach out to Chief Weathers and request a meeting. *Id*. 239:3 to 239:22. Email exchanges indicate their meeting was November 21, 2019, but the email exchanges do not detail what specifics were discussed between them. Weathers-K. Middleton Emails (Ex. 12). Although Kristi Middleton recalls discussing the memes and other past racial incidents, Chief Weathers did not remember any conversation with her including that information. K. Middleton Dep. 78:16 to 80:11; Weathers Dep. 5:4 to 7:4. Kristi Middleton's meeting with Chief Weathers led to Chief Weathers separately meeting with Jervis later that same month over lunch at Sawyer's. Middleton claims he intended to discuss race issues with Chief Weathers, but he dropped the subject because Chief Weathers reportedly indicated wanting to "look forward" and not "look back." Middleton Dep. 231:25 to 232:15 & 243:11 to 246:13. Chief Weathers was the only superior Middleton approached attempting to revisit past discrimination issues after returning to work from his first disciplinary action. *Id*. 249:6 to 249:14.

Middleton does not report experiencing any overtly racially offensive misconduct between returning to work from his first disciplinary action in late 2019 and the start of his second disciplinary action in mid-2020. *Id*. 250:1 to 250:22. During that time period, he generally described some officer opposition to the emerging social justice reform movement as "insensitive" and identified examples involving a few specific LPD personnel. *Id*. 250:23 to

258:6. Middleton confirmed having no discussion with any command staff to indicate he felt the viewpoints were inappropriate or racially insensitive. *Id.* 256:16 to 256:19.

The next year would prove to be one of the most eventful for many law enforcement agencies across the country, including LPD, as Black Lives Matter protests started and continued throughout the summer months. Lexington experienced a series of protests during that time. Middleton's amended civil complaint tries to portray an institution-wide overreaction to the demonstrations within LPD by repeatedly describing the local protests as "not violent" and "peaceful." First Am. Compl. ¶¶ 150-51. The depiction lacks context and suffers from 20/20 hindsight bias. Mass demonstrations inherently involve higher stress and higher anxiety for police. Hrg. 168:23 to 169:7 (Weathers testimony). The stress and anxiety are even more heightened when officers are singled out by protesters. *Id.* 169:12 to 169:20. To the extent Lexington's demonstrations were nonviolent, protests elsewhere involved threats and violence, including in nearby Louisville. LPD's officers experienced threats and had legitimate fears. *Id.* 169:21 to 170:11.

Nonviolence also seems like Middleton's only measuring stick in identifying peacefulness, which is a false equivalency. Even without physical violence, officers had many interactions with protesters that were less than peaceful. Protesters hurled items and leveled insults. Middleton's amended civil complaint acknowledges protesters often directed strong profanity and vulgar dialogue toward police. The protesters broadcasted their taunts over megaphones and confronted officers face-to-face. The worst encounters that police experienced with protesters were not "peaceful" by any stretch. *Id.* 174:10 to 175:4 & 185:1 to 185:14.

Local resident Sarah Williams was commonly regarded as an organizer of Lexington's demonstrations. First Am. Compl. ¶¶ 143-56. LDP officers arrested Williams and other

protesters on or about June 14, 2020 after individuals started breaching police barricades. *Id.*. ¶¶ 227-28. Police seized her phone during the arrest and later obtained a search warrant for communication information. It was suspected Williams had incited protesters to cross the police barricades by communicating with them on her phone. Williams Search Warrants & Affidavits (Ex. 13). The communication information extracted from the phone included Facebook messaging between Williams and Middleton.

Two of Middleton's messages to Williams disclosed confidential internal LPD communications addressing operational plans in responding to the demonstrations. One of his messages referenced attempting to identify the undercover officers monitoring the protest, while another message indicated he would be monitoring the police radio for her. Many other messages from Middleton to Wiliams referenced specific officers and conveyed negative information relating to them. More problematically, the context of some messages indicated Middleton was providing the information to Williams knowing or intending it would be used to confront, attack, and possibly provoke the identified officers while they were on duty during ongoing protests.

The messaging discovered between Wiliams and Middleton prompted another formal complaint against him for Misconduct. Middleton's second PIU investigation was assigned to Lt. David Biroschik. A condensed transcript of the Facebook messaging between Williams and Middleton was prepared and included in Lt. Biroschik's investigation file. Messaging Transcript (Ex. 14). Middleton's exchanges with Williams targeting officers and appearing to encourage confrontation with them included: describing Tyson Carroll as a "pompous smartass fuck" (LEXINGTON 35171); referring to Ryan Truex, McCullough labeled a "bitch," and calling undercover officers he was trying to identify as "cocksuckers" (LEXINGTON 35172); saying "fuck commander Holland" (LEXINGTON 35175); telling Williams he "loved" her getting in

Truex's "fucking face" (LEXINGTON 35178); telling Williams "hell no" to her taking with Assistant Chief Maynard (LEXINGTON 35180); encouraging Williams to give Truex "hell" and trying to "find something for you to add" (LEXINGTON 35185); telling Williams to give Maynard and police the "fucking business" (LEXINGTON 35188); encouraging Williams to tell her sister to give Truex and Bryan Jared "hell," and information to "get under Jareds [sic] skin" (LEXINGTON 35189); telling Williams his "next fuck you" goes to Lt. Johnson (LEXINGTON 35190); telling Williams to give Lt. Newman "horn time" (LEXINGTON 35200); telling Williams to give Brandon Murvachick "some love" (LEXINGTON 35201).

The PIU investigation also included another extensive interview of Middleton. Middleton Interview Transcript (Ex. 15). One of the main interview subjects was Middleton's intent behind providing information to Williams. His messages seemed to contemplate Williams would use the information to confront, attack, and provoke specifically identified officers during the protests. Even Middleton acknowledged such an intent could be inferred from some of the messages. Despite what the messages said, Middleton denied having any intent for Williams to misuse the information from him. He explained that an outside view of the messages in isolation would be misunderstood due to the missing "context" and different "lens." Middleton portrayed his messages with Williams as merely "silly," "flippant," and personal "venting." He further claimed Williams knew and had been told in other phone conversations to keep the information from him private. To the extent Williams or other protesters used personal information and singled out specific officers to confront, Middleton did not think it would have made their jobs harder due to training.

Lt. Biroschik prepared a report at the end of the PIU investigation that concluded Middleton had violated LPD's Misconduct policy. 9/28/2020 Biroschik Memo (Ex. 16) (on

LEXINGTON 26238 to LEXINGTON 26239). His report organized the central misconduct issues into incidents of concern and then detailed the substantiating evidence. The last part of the report summarized interviews. For Middleton, Lt. Biroschik's report described his evasiveness and disingenuousness. *Id*. (on LEXINGTON 26237).

Chief Weathers referred the matter to the DRB for recommendation after his initial review. The DRB once again recommended termination, and so did Chief Weathers when the matter returned to him for final recommendation. Second Recommendation Form (Ex. 17). Middleton contested the proposed termination. LFUCG's Law Department proceeded to prefer charges against Middleton for hearing before council. The finalized charges included alleged Misconduct, Dissemination of Information, General Conduct violations. The Misconduct charge was based on evidence to indicate Middleton had encouraged Williams to confront on-duty officers during active, ongoing demonstrations reflecting discredit on the agency and which could reasonably tend to impair the operation and efficiency of the department. His Dissemination of Information charge derived from the two messages disclosing internal, confidential LPD communications regarding operational responses to the protests. The General Conduct charge related to Middleton's apparent untruthfulness during his PIU interview when questioned about monitoring his radio while the protests were ongoing. Charges (Ex. 18).

Middleton's disciplinary proceedings included prehearing conferences with Mayor Linda Gorton as well as the evidentiary hearing before council on February 18, 2021 with both sides represented by counsel. The parties made openings, presented evidence, and made closings at the hearing. Evidence included testimony from 11 witnesses and 66 exhibits. Council ultimately voted to uphold the Misconduct and Dissemination of Information charges after hearing all the evidence and the arguments. Middleton's General Conduct charge was not upheld.

Testimony included Lt. Biroschik addressing his investigation of Middleton and Chief Weather describing the basis for pursuing Middleton's termination. Chief Weathers addressed how Middleton's dismissal was based on "how he treated his fellow officers." Hrg. 175:1 to 175:13. He explained how protesters singling out officers for attack harmed them emotionally, forced the agency to adjust tactics when targeted officers must be pulled from the line and replaced, and "was a violation of trust" for the fellow officers he worked with. *Id*. 167:7 to 168:1; 168:23 to 169:20; 172:7 to 172:19. Chief Weathers did not see how Middleton could return to work given the nature of his current and past discipline. *Id*. Middleton's actions appearing to encourage confronting officers on-duty was also directly "contrary" to the agency's mission to maintain peace and order during the demonstrations. *Id*. 172:20 to 173:17.

Middleton testified about past racial issues and that the intent of his conversations with Williams was to tell her about his racial experiences. *Id*. 217:22 to 22:7 & 230:15 to 231:7. He disagreed with having disclosed confidential information and continued to maintain that he never intended Williams to repeat the information he provided her. *Id*. 228:3 to 229:6. Middleton believed his communications were bringing light to issues that LPD needed to address. While he indicated LPD has "changes" to make, Middleton described the agency "as one of the best in the nation." *Id*. 235:2 to 236:1.

## STANDARD OF REVIEW

A motion for summary judgment should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court must view all facts and inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is not "genuine" if the record taken as a whole

could not reasonably support a verdict for the non-moving party. *Cox v. Kentucky Dep't of Transportation*, 53 F.3d 146, 150 (6th Cir. 1995).

## ARGUMENTS

**I.  Any claims released by Middleton's disciplinary settlement must be dismissed.**

Middleton's amended civil complaint and KRS Chapter 344 claims appear to mix together alleged incidents occurring both before and after Middleton's October 24, 2019 disciplinary settlement agreement with Chief Weathers on behalf of LFUCG. Settlement agreements are contracts and subject to ordinary contract rules. *See Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 384 (Ky. App. 2002). A contract's plain, unambiguous terms must be enforced as written. *See Kentucky Spirit Health Plan, Inc. v. Commonwealth Finance and Administration Cabinet*, 462 S.W.3d 723, 728 (Ky. App. 2015). The disciplinary settlement agreement terms resolving Middleton's first proceedings expressly release any claim arising from the discipline, investigation, or process.

Middleton's amended civil complaint alleges the disciplinary settlement agreement was "leveraged" to seemingly treat the agreement as improper and unenforceable. First Am. Compl. ¶ 73. The purported leverage was from LPD "knowing that Jervis did not want to place his wife through a second round of dealing with references to Jervis's relations with another woman." *Id*. Middleton's criminal trial was the implied first round, while his impending disciplinary hearing before council would have been the "second round." Although Middleton calls it leveraging, state law legally entitled Chief Weathers and LFUCG to pursue the disciplinary charges against him, which even Middleton acknowledges. Middleton Dep. 223:21 to 223:25.

No Kentucky precedent appears to treat alleged leveraging as valid basis to nullify an enforceable contract or settlement agreement. The alleged pressure Middleton may have felt to

spare his wife further publicity regarding his past affair most closely resembles attempts to invalidate contracts by invoking duress. Kentucky precedent, including within analogous statutory police disciplinary setting, indicates duress is inapplicable here. The Kentucky Supreme Court has held: "[I]t is not duress to threaten to do what one has a legal right to do, nor is it duress to threaten to take any measure authorized by law and the circumstances of the case." *Redmon v. McDaniel*, 540 S.W.2d 870, 872 (Ky. 1976).

The *Redmon* case similarly involved an officer seeking to invalidate his resignation by claiming duress from the police chief having threatened termination. The Kentucky Supreme Court observed that termination "was within the scope of the [chief's] authority" and accordingly found the "chief exercised no duress." *Id.* at 871. Chief Weathers and LFUCG likewise imposed no duress by acting within their legal authority to pursue disciplinary charges against Middleton.[3] The disciplinary settlement agreement and Middleton's release should be enforced.

## II.  Middleton's racial disparate treatment count has one or more unmet claim elements.

Middleton's Count II KRS 344.040 Disparate Treatment claim alleges his prior discipline and underlying proceedings were racially motivated. For the reasons previously explained, Middleton's release as part of the disciplinary settlement agreement should bar any claim arising out of his demotion and associated disciplinary investigation or proceedings. Both disparate treatment issues also fail on the merits.[4]

Two evidentiary paths are available to prove race discrimination within the disparate treatment context. One path involves direct evidence of discriminatory animus, but there is no

---

[3] Middleton's testimony also does not indicate that Chief Weathers used the hearing's potential impact on his wife as a leverage point in the disciplinary settlement negotiations. Middleton Dep. 229:13 to 229:19.

[4] Kentucky KRS Chapter 344 precedent is cited when applicable. If on-point Kentucky decisions are lacking, the Kentucky Supreme Court has approved using analogous federal law and precedent as guidance. *See, e.g.*, *Williams v. Wal-Mart Stores, Inc.*, 184 S.W.3d 492, 495 (Ky. 2005).

qualifying direct evidence in this case.[5] The second path is circumstantial and follows the familiar *McDonnel Douglas* burden-shifting framework. *Williams*, 184 S.W.3d at 495. At the first burden-shifting stage, Middleton must establish four prima facie elements: (1) he is a member of protected group; (2) he suffered an adverse action; (3) he was otherwise qualified for the position; and (4) "'similarly situated' non-protected employees were treated more favorably." *Murray v. Eastern Kentucky University,* 328 S.W.3d 679, 682 (Ky. App. 2009) (elements adapted). Satisfying all four prima facie elements shifts the burden to the employer to articulate a "legitimate nondiscriminatory reason" for any qualifying adverse action. *Williams*, 184 S.W.3d at 497. The burden then shifts back to Middleton to demonstrate pretext. *Id*.

Middleton lacks evidence to establish the fourth "similarly situated" element of his prima facie case. Even if all four prima facie elements are met, the evidence developed from both PIU investigations alternatively furnish legitimate, non-discriminatory reasons for each disciplinary action taken against him. Middleton's disparate treatment claims alternatively fail at the last burden-shifting stage because pretext cannot be demonstrated.

### A. The fourth "similarly situated" element is unmet.

Discovery specifically addressing Middleton's disparate treatment claim requested him to identify similarly situated comparators. His answer listed a range of officers who either were not disciplined or received lesser discipline for engaging in dissemination of information and misconduct. Middleton Int. No. 9 Answer (Ex. 19) (selected answer only). The charges the council upheld in terminating Middleton were based on dissemination of information and

---

[5] Evidence meets the standard if it "directly reflects the alleged animus" and "bears squarely on the contested employment decision." *Hallahan v. The Courier–Journal,* 138 S.W.3d 699, 710 (Ky. App. 2004). Stray workplace remarks and statements by nondecision-makers do not qualify. *See id*. "[O]nly the most blatant remarks" from decision-makers constitute direct evidence. *Plucinski v. Community Action Council*, 2010-CA-002056-MR, 2012 WL 1139319, at *3 (Ky. App. Apr. 6, 2012) (quoting *Carter v. City of Miami,* 870 F.2d 578, 582 (11th Cir.1989)). No evidence satisfies that standard here.

misconduct policy violations. It appears Middleton treats any officer allegedly committed the same policy violations as sufficient to satisfy the similarly situated requirement. Middleton's same-policy-violation approach misapplies the similarly situated standard and commits error.

Kentucky precedent applying the similarly situated requirement to KRS 344.040 claims has followed parallel Sixth Circuit standards. "[S]uitable comparators" must be "similarly situated in all relevant aspects." *The Board of Regents of Northern Kentucky University v. Weickgenannt*, 485 S.W.3d 299, 308 (Ky. 2016)(quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)). *Weickgenannt* further equated "all relevant aspects" as meaning "nearly identical." *Id*. When applying the similarly situated standard specifically within the alleged discriminatory discipline context, relevant factors include whether the proposed comparators "have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Ercegovich*, 154 F.3d at 352; *see also Commonwealth v. Solly*, 253 S.W.3d 537, 542 (Ky. 2008) (same). Furthermore, a plaintiff-employee's more extensive disciplinary history has been recognized as an obvious differentiating circumstance from comparator-employees. *Russell v. Univ. of Toledo*, 537 F.3d 596, 607 (6th Cir. 2008).

Middleton's narrowly focused same-policy-violation approach is insufficient to identify comparators and has been previously rejected. *Barry v. Noble Metal Processing, Inc.*, 276 F. App'x 477, 483 (6th Cir. 2008) (explaining how employees "who violated the same safety policy were not similarly situated because their conduct did not result in serious harm" and rejecting comparison involving "more egregious" conduct). Violations of the same policy may cause greater harm or could be more serious or egregious, which can justify lawful differential

treatment as in this case. *See id.* (collecting cases). These distinguishing factors will defeat attempted comparisons merely based on the same-policy-violation. Having determined Middleton's same-policy-violation approach is deficient, the comparator officers that he proposes do not qualify under a proper similarly situated analysis.

*For Dissemination of Sensitive Information*:

1. Zakary Ridener – His disciplinary violation was due to Ridener disclosing the name of a complainant requesting anonymity. The reported name was "Lynyrd Skynyrd," which Ridener mistakenly believed to be a "fake" call after responding and investigating. Ridener Dep. 6:24 to 7:21; 1/26/2019 Ridener Formal Complaint (Ex. 20). Unlike Middleton, Ridener's disclosure was inadvertent and isolated, his error did not have a severe impact on multiple officers, and Ridener had no disciplinary history of negatively impacting officers.

2. Adam Ray – His disciplinary action involved a single instance of accessing information for non-law enforcement purpose. Unlike Middleton, the incident was isolated, did not involve misleading and impacting multiple other officers, and he did not have any similar disciplinary history comparable to Middleton. Ray's discipline also was in 2012 and long predated Chief Weathers's leadership. 1/15/13 Ray Agreement (Ex. 21) Lex 40998-99.

3. Officer Thorton – Documentation for his disciplinary action appears to be lacking because it is from approximately 2009, which would have predated Chief Weathers. No information indicates Thorton's disciplinary offense or history was comparable to Middleton.

4. Bryan Jared – Middleton's interrogatory answer references dissemination of information by Jared without detailing the incident. Middleton's wife reportedly received secondhand information from a media source to suggest Jared had tipped media about court-filings made against Middleton by Heidi Hillard. Chief Weathers inquired whether Kristi's media source would cooperate. K. Middleton Dep. 83:16 to 84:5. Without a firsthand witness, disciplinary action could not be substantiated. It also appears Jared's alleged tip involved publicly filed court documentation instead of internal LPD materials.

5. Brenna Angel – Middleton alleges Angel disseminated information regarding his criminal prosecution violated law. The legal restriction Middleton appears to invoke is KRS 15.520(6)(c), which prohibits "public statements" until final disposition of charges. That KRS 15.520(b) subsection, however, is referring to and regulating disciplinary charges, not criminal charges.

6. Jonathan Bastian – Middleton's interrogatory answer indicates Bastian displayed police body camera video during a FOP conference. The record indicates Bastian had obtained the video through a lawful open records request prior to displaying it. 11/2/2019 Bastian Formal Complaint (Ex. 22). The complaint was for misconduct based on interactions related to displaying the video. Neither Bastian's isolated incident nor his prior disciplinary history is comparable to Middleton.

*For Misconduct*

Middleton lists nine officers who committed or allegedly committed misconduct. Four of the incidents—King, Lange, Turner, and Dellacamera—predated Chief Weathers and are distinguishable under the "same supervisor" factor. To the extent the incidents reflected discredit on the agency, their actions were isolated altercations that did not negatively impact relationships with multiple officers on the force, unlike each of Middleton's disciplinary actions. 11/2/2015 King Agreement (Ex. 23); 4/6/2016 Lange Agreement (Ex. 24); 9/18/2017 Turner Agreement (Ex. 25). With respect to Middleton's interrogatory answer stating James Dellacamera received no discipline, testimony and documentation reflects Dellacamera was suspended without pay for six months, received mandated EAP, and fit for duty testing, which is significant. 4/13/2012 Dellacamera Agreement (Ex. 26); Middleton Dep. 16:12 to 17:3. Middleton further confirms he is unaware of any other racially offensive misconduct by Dellacamera since that disciplinary action. *Id*. 48:23 to 48:25.

For Bryton Turley who Chief Weathers disciplined, Chief Weathers agreed the allegations against him were serious, but explained Turley had admitted the violation, was suffering from an addiction, and already had sought counseling. Considering the officer's acceptance of responsibility and initiative to improve, Chief Weathers decided to give him a "second chance." Weathers Dep. 49:1 to 50:18. Chief Weathers's approach to Turley more closely tracks Middleton's first discipline to demote instead of the second disciplinary action to terminate. At the point of Middleton termination, his repeated, serious misconduct violations would be differentiating circumstances from Turley. Despite not terminating Turley, the six-month suspension and mandated EAP that Chief Weathers imposed were still significant. 4/27/2020 Turley Agreement (Ex. 27).

Roberto Reyes who Middleton identifies was involved in two incidents close in time involving aggressive tactics and foul language. The discipline that Chief Weathers imposed on him was also a significant three-month suspension. 4/30/2019 Reyes Agreement (Ex. 28). While his conduct violated policy and received discipline, Reyes did not target fellow officers and destroy working relationships with them, which distinguishes him from Middleton. Middleton's interrogatory answer indicates his language included slurs; however, that appears to a separate issue when a citizen directed the slur to him, which Chief Weathers explained. Weathers Dep. 40:12 to 43:15.

The incident involving Ryan Holland described by Middleton's interrogatory answer does not match the produced disciplinary documentation, which was unfounded. 10/13/2019 Holland Informal Report (Ex. 29). For Middleton's reference to Jeremy Brislin's "black ass face around" comment, Chief Weathers had LPD refer that issue and others to LFUCG's HR department. Weathers Emails (Ex. 30). HR's attempts to interview Middleton and investigate were declined. Sparks Email (Ex. 31). The Joe Williams incident identified predated Chief Weathers. LPD had opened an inquiry on its own initiative without a complaint from the victim. While some of the accusations implicated personal relationships similar to Middleton's first disciplinary action, the investigation did not substantiate any suspected use of law enforcement resources, which was substantiated in Middleton's case. Neither Williams nor Middleton were charged or subject to discipline based on the nature of their personal relationships. Furthermore, Middleton's termination involved two misconduct violations, which is incomparable to Williams.[6]

---

[6] A copy of the report has been produced in discovery (LEXINGTON 59882 to LEXINGTON 59900). Due to the personal nature of the subject matter, motion for leave will be pursued to file the material under seal.

**B. Middleton cannot demonstrate pretext.**

The two PIU investigations of Middleton are extensive and detail the information that supported the ensuing disciplinary actions, which furnish legitimate, non-discriminatory reasons for Middleton's two disciplinary actions. To establish pretext, Middleton must "produce sufficient evidence from which the jury [could] reasonably reject the employer's explanation." *Williams*, 184 S.W.3d at 497 (quoting *Manzer v. Diamond Shamrock Chems., Co.,* 29 F.3d 1078, 1083 (6th Cir. 1994)). At the pretext stage, Kentucky precedent follows the Sixth Circuit's three standard proof methods that are: (1) the proffered reasons are false; (2) the proffered reasons did not actually motivate the decision; and (3) the proffered reasons were insufficient to motivate the decision. *Id.* (citing *Manzer*, 29 F.3d at 1084).

The first pretext method considers whether the proffered reasons had no basis in fact. Ample evidence supporting the disciplinary actions are detailed in the PIU investigation reports. Middleton essentially takes issue with the evidence against him and faults LPD for not crediting his explanations instead. LPD and LFUCG believe the conclusions drawn from the evidence were fair, including grounds to question and disbelieve his self-serving explanations. Even if Middleton disagrees and contends the wrong decisions were made, whether the proffered reason was "incorrect" still does not establish pretext. *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)("[T]he employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect."). Kentucky and federal law recognize an "honest belief" rule, which requires "more than a dispute over the facts upon which his discharge was based." *Hughes v. Norton Healthcare, Inc.*, 2019-CA-0222-MR, 2020 WL 7295190, at *12 (Ky. App. Dec. 11, 2020) (quoting *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001)).

The honest belief rule applies when employer has "reasonably relied on the particularized facts before it." *Id*. (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)). In this case, the in-depth PIU investigations and lengthy disciplinary process more than satisfy the honest belief rule requirements. *Smith*, *supra*. ("[W]e do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action."). For Middleton's termination in particular, council's decision-making surely meets the "reasonably informed and considered" standard after receiving testimony, exhibits, and arguments from both sides.

The second pretext proof method is inapplicable. Middleton must show the "sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext." *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000). Middleton's racial discrimination evidence predominately involves scattered incidents with various coworkers over many years. Alleged racial bias involving nondecision-makers do not factor into the second pretext proof method. *Id*. ("Statements by nondecision-makers cannot suffice to satisfy the plaintiff's burden of demonstrating animus.")(internal quotation and alterations omitted). Furthermore, Middleton must "admit[] the factual basis underlying the discharge" to proceed under the second pretext proof method, which he steadfastly denies. *Id*.

The third pretext proof method generally builds on the similarly situated analysis. *Id*. at 762. Middleton identifies no qualifying similarly situated comparators as previously explained.

## III.   Middleton's retaliation count has one or more unmet claim elements.

Count V of Middleton's amended civil complaint alleges retaliation in violation of KRS 344.280. A KRS 344.280 retaliation requires Middelton to establish three prima facie elements:

(1) he engaged in a protected activity: (2) he suffered an adverse action by the employer; and (3) there was a causal connection between the protected activity engaged in and the employer's adverse action. *Charalambakis v. Asbury University*, 488 S.W.3d 568, 583 (Ky. 2016). The *McDonnel Douglas* burden-shifting framework also applies to retaliation claims in the absence of direct evidence, which is lacking in this case. If Middleton satisfies all three prima facie elements, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for any qualifying adverse action. The burden then shifts back to Middleton to establish pretext. *Id.*

Discovery specifically addressing Middleton's retaliation claim requested him to identify his alleged protected activity and adverse actions. Middleton Int. Nos. 7 & 8 Answers (Ex. 32) (selected answers only). His answers referenced the union grievance alleging race discrimination as protected activity and his subsequent demotion as an adverse retaliatory action.  For reasons previously explained, Middleton's release as part of the disciplinary settlement agreement bars any claim arising out of his demotion and associated proceedings, which include the grievance.

Additional protected activity and alleged retaliation identified by Middleton's discovery answers include his second disciplinary charges "after expressing frustration with racism within the department" and termination "following an interview" that described LPD's "history of targeted racism." Well before Middleton's second disciplinary charges, however, a formal compliant was filed and the PIU investigation had initiated. Charges and discipline, including termination, were already possibilities. Although Middleton's alleged protected activity may have predated the charges and termination at the end of the disciplinary process, Kentucky precedent indicates the "timeline negates" any pretext if the employer has "initiated" the disciplinary proceedings prior to the employee's protected activities. *Charalambakis*, 488 S.W.3d at 584.

Middleton's opposition to racism also had nothing to do with the ultimate charges and decision to terminate. The charges upheld by council were based on his dissemination of confidential LPD information and messaging with Williams with the intent to encourage and assist verbally confronting on-duty officers during active, ongoing demonstrations. Those actions, not any opposition to racism, discredited the agency and impaired its efficiency and operation. Legitimate, non-retaliatory reasons accordingly support the decisions to charge and terminate Middleton. And as previously explained, Middleton cannot demonstrate pretext.

**IV.     Middleton cannot establish First Amendment free speech retaliation liability.**

A prima facie Section 1983 First Amendment free speech retaliation claim requires Middleton to establish: "(1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; [and] (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct." *Dixon v. University of Toledo*, 702 F.3d 269, (6th Cir. 2012). "If the employee establishes a prima facie case, the burden then shifts to the employer to demonstrate 'by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct.'" *Id*. A third pretext burden-shifting stage, as in the *McDonnell Douglas* approach, is inapplicable to First Amendment free speech retaliation claims. *Dye v. Office of the Racing Com'n*, 702 F.3d 286, 294–95 (6th Cir. 2012). The first and third prima facie elements as well as the same-decision-anyway burden shifting defense support summary judgment in this case.

### A.     Middleton did not engage in constitutionally protected free speech.

Three requirements have emerged to determine whether public employee speech has constitutional protection: (1) the employee's speech touches on a matter of "public concern"; (2)

the employee must speak as a private citizen and not as an employee pursuant to official duties; and (3) the employee's speech interests outweigh the efficiency interests of the government employer. *Mayhew v. Town of Smyrna, Tennessee*, 856 F.3d 456, 462 (6th Cir. 2017). Whether Middleton engaged in constitutionally protected speech is a question of law. *Id*. at 464.

### (1)   *Middleton's speech does not touch on matters of public concern.*

"Speech is of 'public concern' if it involves issues about which information is needed or appropriate to enable members of society to make informed decisions about the operations of their government." *Farhat v. Jopke*, 370 F.3d 580, 590 (6th Cir. 2004) (citation omitted). Both the "speaker's interest in speaking" and the "public's interest in receiving information" are considered. *See Ryan v. Blackwell*, 979 F.3d 519, 526 (6th Cir. 2020). The Sixth Circuit has "rejected the notion that 'internal personnel disputes or complaint about an employer's performance' constitute a matter of public concern." *Id*. (quoting *Brandenburg v. Hous. Auth. of Irvine,* 253 F.3d 891, 898 (6th Cir. 2001). Middleton alleges his speech addressed a matter of public concern because it concerned racism within LPD. To the extent that *some* parts of *some* of his statements addressed matters of public concern could be true, those parts of his speech were merely incidental to Middleton's speech about issues personal to him that arose out of his grievances with other officers. Thus, Middleton's claim involves "mixed speech" at most, but his First Amendment analysis still fails under the standard that governs mixed speech cases.

Mixed speech cases are "those in which the speech for which the employee claims First Amendment protection arises in the context of an employment grievance or other personnel dispute, but where the employee claims that some part of the speech also touches upon matters of public concern." *Farhat v. Jopke*, 370 F.3d 580, 590 (6th Cir. 2004). The Sixth Circuit has "distilled the 'public concern' test by stating that the court must determine: the 'focus' of

25

the speech; 'the point of the speech in question'; 'to what purpose the employee spoke'; 'the intent of the speech'; or 'the communicative purpose of the speaker.'" *Id.* at 592 (collecting cases). "As a corollary to this 'focus' test, [the Sixth Circuit has] held that the proper inquiry is *not* what might be 'incidentally conveyed' by the speech, and that 'passing' or 'fleeting' references to an arguably public matter do not elevate the speech to a matter of 'public concern' where the 'focus' or 'point' of the speech advances only a private interest." *Id.* at 592–93. Where the focus, point, or communicative purpose is the speaker's "own personal 'beef'" and references to corruption or violation of law are incidental to the message conveyed, then First Amendment protection does not apply. *Id.* at 593. The content of Middleton's speech—particularly when examined in context—makes clear that the focus, point, and communicative purpose were not matters of public concern, but his own personal "beef" with fellow officers.

At a minimum, any interests Middleton was advancing in his messages with Williams should not receive a high level of protection, which lessens the amount of disruption and other factors that the government employer must demonstrate at the next balancing step. *See Bennett v. Metropolitan Government of Nashville & Davidson County*, 977 F.3d 530, 539 (6th Cir. 2020). Furthermore, an "employee who makes an unprotected statement is not immunized from discipline by the fact that this statement is surrounded by protected statements." *Waters v. Churchill*, 511 U.S. 661, 681 (1994). The next balancing step is only "applied to the speech for which [the employee] was fired." *Id.*

### (2) *The government employer efficiency interests outweigh Middleton's free speech interests when applying the* **Pickering** *balancing test.*

The well-known *Pickering* balancing test applies to "determine whether the employee's free speech interests outweigh the efficiency interests of the government as employer." *Id.* (internal citations and alterations omitted). Employee considerations include the "manner, time,

and place of the employee's expression." *Id*. The employer considerations are whether the employee's speech: (a) impairs discipline by superiors or harmony among co-workers; (b) has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary; (c) impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise; or (d) undermines the mission of the employer. *Id*.

Application of the employee speech considerations provide only mixed support to Middleton. Although Middleton's messaging with Williams was not typical on-the-job speech, the speech focused on private interests instead of broad policy debate. *See id*. at 551 (observing how Supreme Court cases "distinguish speech about an employee's job from speech about broader policy" and "distinguish 'on-the-job' speech from speech during the employee's own time.") (J. Murphy concurring in judgment). Conversely, several employer considerations decisively favor the government employer on the other side of the equation.

The PIU investigation report "makes clear the harmony of the office was disrupted" by Middleton's speech appearing to encourage protesters to confront officers with personal information. *Compare id*. at 540. Disharmony based on Middleton's suspected involvement developed as the protests stretched over weeks, and the PIU investigation documented the ongoing fallout from impacted officers who were interviewed. *Compare id*. (referencing "nonstop" office controversy that "lasted for days"). "[D]iscounting the importance of harmonious relationships" would be error in this case. *Id*.

Alongside disharmony, the PIU investigation report establishes Middleton's speech detrimentally impacted his ability to maintain close working relationship with other officers. Chief Weathers further emphasized how Middleton's loss of trust among so many other officers by his actions was the most critical termination factor in his view. Hrg. 172:7 to 172:19. Officer

trust and confidence that their partners "have their back" is especially important within law enforcement. Unlike most other professions, officers are called to risk their safety and well-being to protect and serve the public at large. Not surprisingly, the high "level of teamwork required for effective functioning" within the law enforcement setting has already been recognized. *Bennett,* 977 F.3d at 543-44. Chief Weathers and the interviewed officers reinforce the "invaluable role that team dynamics play in the success of the agency" and "highlight[] the necessity of … being able to work together harmoniously" in order for the agency to effectively safeguard the public. *Compare id.* at 540. Furthermore, Chief Weathers explained how attacks on officers by protesters, which Middleton appeared to encourage, impacted the officers personally and forced the agency to make tactical adjustments in assigning manpower. Hrg. 167:17 to 170:18.

To the extent Middleton's speech may not have impeded himself from performing his duties, his "damaged relationship with … colleagues" would have certainly had a negative impact considering the crucial role that teamwork plays among police officers. *Bennett,* 977 F.3d at 541. Middleton's speech also may not have directly undermined discipline by supervisors at the time of his speech. However, the widespread loss of trust in Middleton put Chief Weathers in a position to take disciplinary action. If Chief Weathers had failed to address it, the "inaction" risked being "seen as an endorsement" that officers can freely attack each other and would have "impaired future discipline" of disruptive infighting. *Id.* at 540. Confidence in Chief Weathers's leadership would have also been called into question. Removing Middleton, after his track record of violating officer trust, thus became part of the "ameliorative response." *See id.* at 541.

Under the last factor, Middleton's messaging with Williams undoubtedly "detracted" from the agency's mission, especially with respect to the agency's approach to the

28

demonstrations. Hrg. 172:20 to 173:17. LFUCG attorney Horn aptly contrasted how Middleton's messaging was directly contrary to the agency's objectives:

> This was a tense time for the community, for protesters, and the police. Police responsibility during the protests was to work to maintain law and order, protect people, property, and the peace; to de-escalate situations. De-escalation is something we talked a lot about over the past year. Officer did the opposite. During this highly tense, highly anxious event, Officer Middleton was singling out individual police officers and sending information about the officer to a leader of the protest to use against the officers. Instead of trying to de-escalate things, he was providing information to inflame things. Instead of helping officers remain calm, he was trying to agitate them. Instead of working to make the situation less dangerous, his conduct made it more dangerous.

*Id*. 278:6 to 278:20. Middleton's mission-undermining resonated with the council during the disciplinary hearing and it equally drives home the final factor in this case.

**B.**      ***Middleton lacks evidence to establish a causal connection.***

The third prima facie First Amendment free speech retaliation element requires Middleton to establish a causal connection between the alleged protected speech and his termination. Middleton "must point to specific, nonconclusory allegations reasonably linking" the termination to the alleged protected speech. *Haddad v. Gregg*, 910 F.3d 237, 251 (6th Cir. 2018); *Vereecke v. Huron Valley School Dist.*, 609 F.3d 392, 400 (6th Cir. 2010). The alleged protected speech must have a "substantial or motivating factor" in the termination. *Id*. A "motivating factor is essentially but-for cause—without which the action being challenged simply would not have been taken." Id. (internal quotations omitted). "Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant. If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Id*. Sixth Circuit precedent has tended to merge the causation and burden-shifting analysis together on summary judgment. *Haddad*, 910 F.3d at 251; *Vereecke*, 609 F.3d

at 400. Chief Weathers respectfully submits the evidence to support Middleton's termination either refutes the third First Amendment free speech retaliation causation element or establishes the same-decision-anyway burden-shifting defense.

        **C.**      ***Qualified immunity alternatively shield Chief Weathers from liability.***

The qualified immunity doctrine protects government actors "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity recognizes that "reasonable mistakes can be made[.]" *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007) (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)). This doctrine accordingly gives state actors "ample room for mistaken judgment" and protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Scott v. Clay County*, 205 F.3d 867, 873 n. 9 (6th Cir. 2000) and *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Once a defendant pleads qualified immunity from a Section 1983 claim, the burden is on the plaintiff to establish the defendant is not entitled to qualified immunity. *Binay v. Bettendorf*, 601 F.3d 640, 647 (6th Cir. 2010). To do so, the plaintiff must demonstrate (1) the defendant violated a constitutional right of the plaintiff and (2) the violation involved a *clearly established* constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (emphasis added). The Supreme Court has recently stressed "lower courts 'should think hard, and then think hard again,' before addressing both qualified immunity and the merits of an underlying constitutional claim.'" *Dist. Of Columbia v. Wesby*, 138 S.Ct. 577, 589 n.7 (2018) (quoting *Camreta v. Greene*, 563 U.S. 692, 707 (2011). For the reasons previously stated, Chief Weathers submits Middleton's free speech rights were not violated. At minimum, the law does not clearly establish

that Middleton's speech could have been constitutionally protected to entitle Chief Weathers to qualified immunity.

**V.      Middleton's hostile work environment count has one or more unmet claim elements.**

For Middleton's race-based hostile work environment claim to survive summary judgment, Middleton must establish five elements: (1) he is a member of a protected class; (2) he was subjected to unwelcomed racial harassment; (3) the harassment was race based; (4) the harassment unreasonably interfered with his work performance by creating an environment that was intimidating, hostile, or offensive; and (5) employer liability. *Pusey v. United Parcel Service, Inc.*, 393 F. App'x 366, 369 (6th Cir. 2010) (applying Kentucky and federal law together); *see also Clark v. United Parcel Serv., Inc.,* 400 F.3d 341, 347 (6th Cir.2005).

Middleton is a member of a protected class to satisfy the first prima facie element. For the second element, discovery specifically addressing Middleton hostile work environment claim requested him to identify any alleged unwelcomed racial harassment. Middleton Int. Nos. 3-5 Answers (Ex. 33). His answer listed many issues that do not properly qualify under the third element's "race based" standard, which are then removed from the fourth element analysis. When the fourth element is applied to the facts of this case, Middleton lacks evidence—especially after removing nonqualifying issues and incidents—to satisfy the severe and pervasive harassment standard that governs. Finally, the fifth employer liability element is unmet due to the disciplinary settlement agreement, which resolved and ended any employer action on any then known issues and incidents. Since the agreement, employer notice of new qualifying race-based harassment is lacking.

### A. Alleged incidents not meeting the race-based standard.

"Harassment is based on race when it would not have occurred but for the plaintiff's race;" however, the "harassing conduct need not be overtly racist to qualify." *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 511–12 (6th Cir. 2011)(citing *Clay v. United Parcel Serv., Inc.,* 501 F.3d 695, 706 (6th Cir.2007)). "A plaintiff may prove that harassment was based on race by either (1) direct evidence of the use of race-specific and derogatory terms or (2) comparative evidence about how the alleged harasser treated members of both races in a mixed-race workplace." *Id.* (citing *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80–81, 201 (1998).

Middleton has no direct or circumstantial evidence that his listed adverse treatment was race-based. The disciplinary settlement was mutually agreed to and not "forced" as claim. For the reasons previously explained, there were also legitimate, non-discriminatory reasons for Middleton's past disciplinary actions. Middleton's self-serving attacks that he was targeted for being in a relationship with a white woman and bridging the gap with black protesters can be rejected. In addition, Middleton's first discipline focused on the impact his actions had on fellow officers, which did not involve "unequivocally" crediting the allegations that his mistress had made. There is likewise no evidence that any referenced recommendations or the circulated emails influenced Chief Weather's independent review and analysis regarding the appropriate discipline for Middleton's misconduct.

Middleton's identified adverse treatment also fails comparative analysis. Although Middleton complains white officers have not been disciplined for extramarital affairs, his affair was not the basis for any discipline against him, either. Middleton's previous supervisory assignment within the Police Chief's office and position as the "face" of the agency further

distinguishes him from other regular officers with respect to the greater publicity that his misconduct attracted. To the extent Middleton alleges he was treated worse than other white officers who had committed more "severe misconduct," Middleton has not identified any valid comparators as previously explained.

Middleton simply draws from subjective beliefs and personal views in characterizing his alleged adverse treatment as race based, which is improper. *Lovelace v. BP Products N. Am., Inc.,* 252 F.App'x 33, 40–41 (6th Cir.2007). Other listed harassment incidents that Middleton observed similarly involve improper assumption on his part or are inaccurate. He admittedly lacks knowledge of the actual facts of any alleged racially targeted policing or the underlying details of any alleged racially disparate discipline. Middleton Dep. 11:14 to 11:18 ("Q: … Do you, as we sit here today, do you know whether any race complaints, race bias complaints submitted to the department were true or false? A: I don't have a clue."); 26:16 to 26:19 ("Q: Are you aware of any complaints, race bias complaints resolved with citizens that should have went further? A: Sitting right here I can't recall ….").

While Middleton claims racially biased policing complaints are "swept under the rug," his amended civil complaint cites racial bias statistics and illustrates that those complaints are open record. Likewise, Middleton's discovery answer contends "Black citizens were arrested for 'rioting' at times when no such conduct was taking place, while, simultaneously, White citizens were permitted to set fires, burn couches and get violent in the streets without being arrested," but his complaint confirms that the celebrations involving fires and couch burning actually involved over 80 arrests. First Am. Compl. ¶ 101.

Middleton's amended civil complaint and discovery answer further identify a range of specific interactions. Some of them are not overtly racial. He identifies a meme depicting him

with a scared white woman, but the meme started circulating after the police report his white mistress had made against him and news reporting. Middleton Dep. 262:15 to 263:1. It appears the meme "occurred" in response to the circumstances surrounding the police report, not due to his race. Middleton also identifies references to him as the "Chief's Boy" occurring while he was assigned to the Chief's Office.

### B. The alleged incidents do not meet the severe or pervasive standard.

Alleged harassment must be "both objectively and subjectively offensive as determined by 'looking at all the circumstances'" to satisfy the fourth prima facie element. *Ammerman v. Board of Educ., of Nicholas Cnty.*, 30 S.W.3d 793, 798 (Ky. 2000) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)). Specifically identified factors to consider include: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether the conduct unreasonably interferes with an employee's work performance. *Id*. Whether the alleged harassment meets the "severe or pervasive" standard is the "key test." *Kelly v. Senior Centers, Inc.*, 169 F. App'x 423, 428 (6th Cir. 2006). Actionable harassment does not include "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *Ammerman*, 30 S.W.3d at 798 (explaining "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive"). The Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment[.]" *Faragher*, *supra*.

The various harassment incidents that Middleton lists fall well short of meeting the high severe or pervasive standard. Those incidents and relevant surrounding circumstances include:

34

- One meme depicting Middleton a scared white woman has been identified. As previously explained, the meme started circulating after the police report his white mistress had made against him. Sgt. Bryan Jared shared the meme with Middleton and followed up to check on Middleton. Middleton did not request Jared to take any further action. He also believes Jared sent the meme to him accidently and was not genuinely concerned about his well-being. Middleton Dep. 87:8 to 87:15. Only one other meme has been described depicting Middleton peeping into the home of college students to watch a UK ballgame.

- Lt. Jeremy Brislin (then sergeant) allegedly told Middleton to turn his "black ass around" at a training session. Middleton and Brislin were good friends at the time. *Id*. 104:10 to 104:15. Brislin explained the comment was made in jest based on a story Middleton was relating about his off-duty work at a concert, which Middleton denies. Nonetheless, it is undisputed Brislin personally apologized to Middleton and did not make any more offensive remarks after that. *Id*. 104:19 to 104:23 & 107:2 to 107:8. Middleton claims he described the incident to Lt. David Biroshick after he later confronted Brislin. Lt. Biroshick recalled hearing about the dispute secondhand from Lt. Todd Johnson. His understanding was Brislin and Middleton worked out the issue between them. Indeed, Brislin and Middleton resumed activities together outside work, but Middleton claims his relationship to Brison was not as close as it had been. *Id*. 105:12 to 105:18.

- Officer Brandon Murvachick reportedly called Middleton a "token boy." Although Middleton indicates another person had made the comment jokingly during an FOP legislative lobbying activity, Middleton took offense when Murvachick said it. *Id*. 132:10 to 133:19. Middleton addressed the issue with Murvachick, but did not make any other report. It is undisputed Murvachick personally apologized to Middleton and made no more racially offensive remarks. *Id*. 133:25 to 134:6 & 136:12 to 136:15.

- Lt. Tommy Perkins reportedly referred to Middleton as the "Chief's Boy" and referenced him being on the "fast-track." Middleton did not contemporaneously object to Perkins or make a report. Lt. Perkins later was assigned the first PIU investigation of Middleton. Middleton indicates minimal interaction with Lt. Perkins thereafter. *Id*. 138:3 to 139:2; 139:19 to 139:21; 140:25 to 141:9

- Middleton indicates a supervisor sent him news articles about black officers facing discipline. The messages were addressed to "Dave" and it appears it was sent to Middleton inadvertently. Middleton just assumes it was intentional. *Id*. 156:13 to 157:24.

- Middleton produced one text message thread with an officer using the term "ni##er." Although Middleton did not object to the message or make a report, another person on the message thread responded to stop it. Middleton reports no other racially offensive comments by that officer. *Id*. 148:22 to 149:19 & 151:7 to 151:13.

- Middleton allegedly noticed Lt. Jackie Newman giving low scores to black applicants. Participation on a board to review and screen applicants was for a set term. In addition, Newman would have been just one of several members reviewing and scoring application. Middleton recalled only potentially impacted applicant. He recalls

mentioning his observations regarding Newman to a coworker. Middleton further alleges he reported anonymous racists notes on his home garage to Newman, but she allegedly expressed disinterest.

- Middleton reports Officer James Dellacamera referred to ni##ers and white women with black men as "ni##er lovers."

The identified incidents were isolated occurrences over the course of many years. Those incidents that Middleton addressed directly were even met with apologies. The comments reportedly made by Dellacamera were in 2012 and Middleton is unaware of any other racial misconduct by him. Middleton Dep. 48:23 to 48:25. Analogous Sixth Circuit precedent indicates the collection of incidents described by Middleton are insufficient. *Compare Kelly*, 169 F. App'x at 429 (rejecting hostile work environment that included "two staff members' use of the pejorative slur word "ni##er," reference to "token black," "three racist jokes," commenting on black staff member "bathroom habits," and supervisory "tolerance"); *Smith v. Leggett Wire Co.,* 220 F.3d 752, 760–61 (6th Cir.2000) (holding incidents including one racial slur directed at plaintiff, racially offensive and obscene cartoon circulated in workplace, and African–American employee referred to as a "gorilla" not severe or pervasive); *Bowman,* 220 F.3d at 464 (holding that five incidents of racial harassment did not constitute severe or pervasive conduct) *with Jackson v. Quanex Corp.,* 191 F.3d 647 (6th Cir.1999) (involving supervisors who routinely used the word ni##er and other racial slurs, employees gave out "award" stickers for firing minority employees; workplace restrooms had graffiti stating "KKK is back" and depicting lynchings, an African–American worker's shirt was defaced with the slur "Ni##er Sucker," and white worker wore a swastika to work); *Pollard v. DuPont de Nemours, Inc.,* 412 F.3d 657, 659–664 (6th Cir.2005) (involving relentless, daily, consistent pattern of sexual harassment, including refusal to accept supervision from the plaintiff female supervisor, daily use of sexual slurs,

altering machines to make plaintiff's job more difficult, and intentional "dirty tricks" such as slashing tires and burning plaintiff's food)

Middleton also describes how he was able to move past particular incidents and continue performing his job day to day. Middleton Dep. 59:13 to 60:2 & 73:12 to 73:21. Although Middleton indicates the incidents started weighing on him, evidence to establish the incidents unreasonably interfered with his job performance is lacking. *Compare Kelly*, 169 F. App'x at 430 (Kelly asserts that the environment was increasingly "hostile" but he does not recite any specifics of how that hostility interfered with his job duties. The record accordingly supports summary judgment. *Id*. ("There is no evidence suggesting that Kelly was not performing his job duties, performing them in substandard fashion, or prevented from doing his job, as a result of the comments, jokes and slurs he heard at the office.").

### C. Employer liability cannot be established.

Different employer liability standards apply for supervisor and coworker harassment. *Clark v. United Parcel Service, Inc.*, 400 F.3d 341, 348 (6th Cir. 2005). Supervisory harassment is subject to strict liability; however, employers have an affirmative defense if (a) "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id*. (quoting *Faragher*, 524 U.S. at 807–08). The minimal supervisory harassment alleged by Middleton—by Lt. Perkins and Lt. Newman—certainly fails the severe or pervasive standard. In addition, Middleton admittedly made no complaints regarding these incidents under LFUCG's anti-harassment policy.

Most of the incidents identified by Middleton involve coworkers. The standard for coworker harassment is whether the employer "knew or should have known of the charged [race] harassment and failed to implement prompt and appropriate corrective action." In this case, the coworker and supervisor incidents all generally predate Middleton's first disciplinary action. Middleton alleges his CBA Article XX grievance filed during the first disciplinary process included alleged racial issues; however, the grievance was withdrawn and no further action would be taken as part of the disciplinary settlement agreement. Prior to the grievance, Brislin's alleged comment was the only issue that Middleton reportedly disclosed to management that could have been construed as possible harassment. To the extent Middleton's grievance provided notice to the employer of racial discrimination, the mutual agreement to withdraw the grievance and take no further action necessarily forecloses further potential liability on the part of the employer. *See*, *e.g.*, *Ford v. Marion Cnty. Sheriff's Office*, 942 F.3d 839, 853 (7th Cir. 2019) (explaining how "intervening action" between the employer and employee "can interrupt the hostile work environment claim")(citing *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118 (2002)). Middleton indicated no harassing incidents after returning to work.

## VI.     Middleton's disparate treatment count lacks proper foundation.

To succeed on a disparate impact claim, a plaintiff must "prove that a particular employment practice, although neutral on its face, has produced a significant adverse effect on a protected group to which the plaintiff belongs. *Kovacevich v. Kent State University,* 224 F.3d 806, 830 (6th Cir. 2000)(citations omitted). The first prima face element requires the plaintiff to isolate and identify a specific employment practice that he alleges unlawfully discriminates against a protected group. This "involves more than simply 'point[ing] to a generalized policy that leads to such an impact." *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 404 (6th Cir. 2008).

The second element requires Plaintiff to provide statistical substantiation for his allegations. The failure to provide such evidence is fatal to a disparate impact claim. *Adams v. Lucent Technologies, Inc.*, 284 F. App'x 296, 304 (6th Cir. 2008). Both elements are unsatisfied here. Middleton's Complaint alleges facts suggesting he was treated differently than his white counterparts but makes no allegation that LFUCG engaged in a practice which, although neutral on its face, had a discriminatory impact on black police officers. Likewise, Middleton puts forth no statistical evidence to support his claim. Instead, Middleton's disparate impact allegations read as an extension of his disparate treatment claim which, for the reasons outlined elsewhere herein, is also deficient.

**VII.    Undisputed facts and law do not establish any breach of contract.**

Most of Middleton's breach of contract claims reallege discrimination and harassment issues. For the reasons previously stated, his discrimination and harassment claims either were released or no violation of law can be shown. The allegation that the evidence at his disciplinary hearing exceeded the charges appears to conflate the formal complaint identifying misconduct with the actual charges later preferred against him. To the extent Middleton's contract count alleges he received insufficient notice of the allegations prior to his PIU interview, the formal complaint was provided in advance and identified the policy violation consistent with standard practice, referencing the release of confidential communications and making disparaging remarks. Alternatively, any potential technical violations regarding notice or timing do not support a breach of contract claim, which requires evidence of causation and damages. Even after the PIU interview and formal complaint investigation, Middleton had a full evidentiary hearing and opportunity to testify with advance notice of the preferred charges. *Pharo Distributing Co. v. Stahl*, 782 S.W.2d 635, 638 (Ky. App. 1989)(finding that when the

defendant's breach stemmed from its failure to give reasonable notice of the termination of the contract the plaintiff's burden was to prove damages stemming from that failure, not the termination of the contract).

## CONCLUSION

Defendants respectfully request summary judgment entered in their favor on all claims.

Respectfully submitted,

STURGILL, TURNER, BARKER & MOLONEY, PLLC

BY:     /s/ *Derrick T. Wright*
        Derrick T. Wright (KBA No. 91627)
        Charles D. Cole (KBA No. 86977)
        Maureen C. Malles (KBA No. 98534)
        333 West Vine Street, Suite 1500
        Lexington, Kentucky 40507
        Telephone:  859-255-8581
        Facsimile:  859-231-0851
        Email:  dwright@sturgillturner.com
                ccole@sturgillturner.com
                mmalles@sturgillturner.com
        ATTORNEYS FOR DEFENDANTS,
        LEXINGTON-FAYETTE URBAN
        COUNTY GOVERNMENT D/B/A
        LEXINGTON POLICE DEPARTMENT,
        CHIEF LAWRENCE WEATHERS,
        in his individual capacity

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 20, 2022, the foregoing document was electronically filed with the Clerk of this Court using the CM/ECF eFiling system, which will send notice to the following:

Sam Aguiar                                    sam@kylawoffice.com
Jon Hollan                                    jhollan@kylawoffice.com
Hollan & Aguiar, PLLC
148 Jefferson St., Suite A
Lexington, KY 40508
*Counsel for Plaintiff*

                                        /s/ *Derrick T. Wright*
                                        Derrick T. Wright
                                        ATTORNEYS FOR DEFENDANTS,
                                        LEXINGTON-FAYETTE URBAN
                                        COUNTY GOVERNMENT D/B/A
                                        LEXINGTON POLICE DEPARTMENT,
                                        CHIEF LAWRENCE WEATHERS,
                                        in his individual capacity

x:\wdox\clients\65712\0006\pleading\draft\01693773.doc