UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| JERVIS MIDDLETON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 21-156-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| LEXINGTON FAYETTE COUNTY | ) | **MEMORANDUM OPINION** |
| URBAN GOVERNMENT, et al., | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Defendant Lexington-Fayette County Urban Government, doing business as the Lexington Police Department ("LFUCG"), and Defendant Chief Lawrence Weathers have moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  They contend that Plaintiff Jervis Middleton's claims for hostile work environment, disparate treatment, disparate impact, breach of contract, retaliation, and free speech retaliation should be dismissed with prejudice.  [Record No. 47]  The motion will be granted because, as explained more fully below, there are insufficient comparators, various claims have been waived, and Chief Weathers is protected by qualified immunity.

### I.  Background

LFUCG terminated Middleton, a former Lexington police officer, for allegedly making hostile remarks about fellow officers and disclosing sensitive department information to protestors during the summer of 2020.  [Record No. 1-1]  Approximately two years before his termination, Middleton's ex-mistress contacted police after seeing a male on her garage roof looking into her window.  [Record No. 47-2]  She indicated that she believed Middleton was

- 1 -

the male subject.  And she also believed that Middleton had used the police database to search for information about her new boyfriend and a past associate.  [*Id.*]  After Middleton was acquitted of criminal charges, a formal complaint was filed, initiating an internal administrative investigation.  [Record No. 47-7]  The formal complaint alleged that Middleton utilized fellow officers to drive by his mistress's home, "query and provide information on license plates" in her driveway, and that Middleton "acknowledged he was at [the mistress's] home" the evening that an individual looked into her window.  [*Id.*]  The complaint indicated that the incidents generated substantial negative publicity and discredit to the Lexington police department and to Middleton.  [*Id.*]  Middleton's alleged actions constituted "misconduct," violating an internal police department policy.  [*Id.*]

The department's Public Integrity Unit ("PIU") conducted an internal investigation and submitted a report to Weathers, who referred the issue to the Disciplinary Review Board ("Board").  [Record No. 47-10]  The Board recommended termination, but Weathers proposed demotion and a three-month suspension.  But Middleton did not accept Weathers' proposal.  Thereafter, the local union filed a grievance under its collective bargaining agreement, alleging that Middleton's discipline involved "discriminatory conduct."  [Record No. 47-11]  However, LFUCG and Middleton settled the dispute before the disciplinary hearing.  [Record No. 47-12] The settlement provided that Middleton would be demoted but he retained the right to participate in the next promotion cycle.  [*Id.*]

Black Lives Matter protests commenced in Lexington in the spring and early summer of 2020.  Rumors began to spread among officers that Middleton supplied police officers' personal information and confidential agency information to protest organizers.  Police arrested Sarah Williams, a "known protestor" and Middleton's cousin, for inciting a riot on or

about June 14, 2020.  A search of Williams' phone and social media accounts pursuant to a warrant revealed that Middleton had been communicating with Williams.  An investigation memorandum alleged that Middleton supplied Williams with personal details about individual officers, and "provided her copies of sensitive 'law enforcement only' communications, including emails and text messages which outlined staffing, operational, and deployment plans."  [Record No. 58-30]

Middleton contends that he did not disclose strategic plans or make any comments about officers which he was not permitted to disclose.  [*Id.*]  He responded by amending his complaint to assert claims for hostile work environment, disparate treatment, disparate impact, breach of contract, retaliation, and a claim against Chief Lawrence Weathers for free speech retaliation.  [*Id.* at 250-64]  LFUCG previously moved to dismiss Middleton's breach of contract claim based on sovereign immunity but that motion was denied.  Thereafter, the parties conducted extensive discovery, and the defendants have filed a motion for summary judgment, seeking the dismissal of all claims. [*See* Record No. 47, 58, 70, 80, 82.]

## II.  Standard of Review

Summary judgment is appropriate when the moving party shows that there is no genuine dispute regarding any material fact and that he or she is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  Once the moving party has satisfied this burden, the burden shifts to the nonmovant. In response, the nonmoving party may not simply rely on its pleadings but must "produce evidence that results in a conflict of material fact to be resolved by a jury."  *Cox v. Ky. Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).  In other words, the nonmoving party must present "significant probative evidence that establishes more than some metaphysical doubt as to the

material facts." *Golden v. Mirabile Invest. Corp.*, 724 F. App'x 441, 445 (6th Cir. 2018) (citation and alteration omitted).

The Court affords all reasonable inferences and construes the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute over a material fact is not "genuine" unless a reasonable jury could return a verdict for the nonmoving party. The Court may not weigh the evidence or make credibility determinations but must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986); *see also Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015).

Finally, the Court notes that the existence of a scintilla of evidence favoring the nonmovant is not sufficient to avoid summary judgment. *Anwar v. Dow Chem. Co.*, 876 F.3d 841, 851 (6th Cir. 2017) (citing *Anderson*, 477 U.S. at 252).

### III.  Analysis

### A.  The Prior Settlement Agreement

LFUCG contends that the parties' settlement agreement from Middleton's first disciplinary action bars his hostile work environment and disparate treatment claims, in part, because the agreement's plain language precludes "any claim" arising out of Middleton's "demotion and associated disciplinary investigation or proceeding." [Record No. 82, p.3] But Middleton contends that the contract language limits the scope of the settlement agreement, and "does not pertain to claims of discrimination."[1]  [Record No. 58, p. 39-40]

---

[1]      Middleton also asserts in his amended complaint that the settlement was "leveraged." However, his briefs do not argue or allege duress, unconscionability, or otherwise mention

"A settlement agreement is a type of contract which is governed by contract law." *Ford v. Ratliff*, 183 S.W.3d 199, 202 (Ky. Ct. App. 2006) (citing *Frear v. P.T.A. Industries, Inc.*, 103 S.W.3d 99, 105 (Ky.2003)); *see also Sweeny v. United States*, 84 U.S. 75, 78 (1872). "[I]f the language of a contract 'is unambiguous, the meaning of the language is a question of law, and the intent of the parties must be discerned from the words used in the instrument.'" *Ratliff*, 183 S.W.3d at 203.[2]

The settlement agreement in this matter states:

> Middleton hereby waives and releases the LFUCG and its officers, employees, and elected and appointed officials from ***any claim of any nature whatsoever arising from, or that otherwise could have arisen from***, the investigation, discipline, or process related to the disciplinary matter resolved by the Letter of Conformity and this Agreement.  This waiver and release are only intended to relate to ***any claim*** arising prior to the date of Middleton's return to work from administrative leave without pay. . . . The Parties agree that the disciplinary matter relating to Middleton having been resolved, any pending grievance that may remain filed by Middleton or on his behalf by the Fraternal Order of Police, Bluegrass Lodge #4, is also resolved or hereby withdrawn.  Therefore, no further action is necessary or will be taken as to such grievance.

[Record No. 47-12 (emphasis added)]  The accompanying "Agreement of Conformity" contains the following statement:

> In further consideration of the acceptance of the above recommendation . . . I do . . . hereby expressly release and forever discharge the Lexington-Fayette Urban County Government, its officers, agents, employees, and their successors and assigns from ***all claims, demands, actions, damages or causes of action and from all liability for damages of whatsoever kind, nature of***

---

"leverage" regarding the settlement agreement.  Thus, this argument is waived.  *See McCowan v. City of Philadelphia*, No. 19-3326, 2022 WL 1557779, at *15-16 (E. D. Pa. May 17, 2022) (collecting cases).

[2]      Neither party argues that the settlement agreement is ambiguous.

> ***description that I ever had, now have, or may have against the
> aforementioned entities created by or arising out of the action
> contained herein***.

[*Id.* (emphasis added)]

It is clear from the above language that the parties intended to release LFUCG from

any possible claims that Middleton could have brought during his first disciplinary hearing,

including discrimination.  By definition, a release "is a private agreement amongst parties

which gives up or abandons a claim or right to the person against whom the claim exists or the

right is to be enforced or exercised.  In other words, a release is a discharge of a claim or

obligation and surrender of a claimant's right to prosecute a cause of action." *Frear v. P.T.A.*

*Industries, Inc.*, 103 S.W.3d 99, 107 (Ky. 2003).

Here, the language is broad and encompassing.  Middleton released LFUCG and Chief

Weathers from any kind of claim that he could have brought until the day of settlement.  This

does not, however, preclude a separate claim of discrimination based on facts occurring after

the settlement.

### B.  Discrimination: Disparate Treatment and Disparate Impact

Middleton argues that he was subjected to race-based discrimination in violation of the

Kentucky Civil Rights Act ("KCRA").  [Record No. 58, p. 27]  Kentucky courts "consider the

way the Federal act has been interpreted" because the KCRA is "virtually identical" to the

Federal Civil Rights Act ("FCRA").  *Jefferson Cty. v. Zaring*, 91 S.W.3d 583, 586 (Ky. 2002)

(quoting *Harker v. Federal Land Bank of Louisville*, 679 S.W.2d 226, 229 (1984)).

Under the KCRA and FCRA, a plaintiff may show discrimination under either a

disparate treatment theory or disparate impact theory. *See Reminder v. Roadway Express, Inc.*,

215 F. App'x 481, 485 (6th Cir. 2007); *White v. Rainbo Baking Co.*, 765 S.W.2d 26, 29 (Ky.

Ct. App. 1988) (citing *Rowe v. Cleveland Pneumatic Co.*, 690 F.2d 88 (6th Cir. 1982)). "[T]he difference between disparate treatment and disparate impact is that with a disparate impact claim, the plaintiff need not prove discriminatory intent but must demonstrate the 'existence of an employment practice which, although neutral on its face, has the effect of disproportionately affecting persons in a legally protected group.'" *Reminder*, 215 F. App'x at 485 (quoting A*bbott v. Federal Forge, Inc.*, 912 F.2d 867, 872 (6th Cir. 1990)). Conversely, "[t]o prevail under the disparate treatment theory, the plaintiff must show that his employer treated some people less favorably due to their race, color, religion, sex or national origin." *White*, 765 S.W.2d at 29.

### 1. Disparate Treatment

Disparate treatment may be shown through direct or circumstantial evidence. *Williams v. Wal-Mart Stores, Inc.*, 184 S.W.3d 492, 495-96 (Ky. 2005). "Direct evidence is evidence, which if believed by the trier of fact, will prove the particular fact in question without reliance on inference or presumption." *Kentucky Dept. of Corrections v. McCullough*, 123 S.W.3d 130, 135 (Ky. 2003) (quoting *Walker v. Glickman*, 241 F.3d 884, 888 (7th Cir. 2001)). It "is evidence that directly reflects the alleged animus and that bears squarely on the contested employment decision." *Hallahan v. The Courier-Journal*, 138 S.W.3d 699, 710 (Ky. App. 2004). "However, direct evidence does not include stray remarks in the workplace, statements by decision-makers unrelated to the decisional process itself, or statements by nondecision-makers." *Id.*  In the present case, Middleton contends that he has "direct evidence of racial discrimination" because of his co-workers' comments.  [Record No. 58, p. 28]   But Middleton's fellow sergeant and officers made the subject comments during meetings or police

functions.[3]  The comments were "stray remarks in the workplace," and not a statement by a decision-maker during the "decisional process itself."[4]

A plaintiff may show disparate treatment through circumstantial evidence, which implicates "the familiar three-step burden-shifting framework" of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), even if there is no direct evidence.  *See Jones v. Potter*, 488 F.3d 397, 403-04 (6th Cir. 2007).  Under this framework, the plaintiff must establish a *prima facie* case before the burden "shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged employment decision."  *Id.* at 404 (citing *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).  If the employer is successful, the "burden returns to the plaintiff to prove by a preponderance of the evidence that the employer's proffered reason was in fact a pretext designed to mask illegal discrimination."  *Id.*

A *prima facie* case of disparate treatment requires the plaintiff to demonstrate: "(1) membership in a protected class; (2) an adverse employment action; (3) qualification for the position; and (4) that a comparable person outside the protected class was treated more favorably than the plaintiff."  *White v. Coventry Health & Life Ins. Co.*, No. 14-CV-00645, 2015 U.S. Dist. LEXIS 147910, at *19 (W.D. Ky. Oct. 30, 2015) (citing *Clay v. UPS*, 501 F.3d 695 (2007)).  LFUCG argues that Middleton has not met the fourth *prima facie* element by offering proof that LFUCG treated a similarly situated and non-protected employee more

---

[3]     Middleton also does not offer any statements that were made after his settlement agreement.

[4]     Even if Middleton argues that Lieutenant Perkins' comments were also direct evidence, this does not satisfy the standard. [*See* Record No. 49, p. 139; *Hallahan*, 138 S.W.3d at 710.]

favorably.  [Record No. 47-1, p. 16][5]  Additionally, it contends that, even if Middleton shows a *prima facie* case, he was terminated for a legitimate nondiscriminatory reason—his history of policy violations—and Middleton fails to show pretext.

To survive summary judgment, a plaintiff "need not demonstrate an exact correlation . . . to be similarly situated with the non-protected, more favorably treated employee, but [he] must show relevant similarity."  *Giles v. Norman Noble, Inc.*, 88 F. App'x 890, 894 (6th Cir. 2004).  Factors include whether the two individuals were: (1) subject to the same "ultimate decision-makers"; (2) bound by the same standards; and (3) "have engaged in the same conduct 'without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'"  *Barry v. Noble Metal Processing, Inc.*, 276 F. App'x 477, 480-81 (6th Cir. 2008) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)).

Middleton identifies the following seven individuals whom he believes engaged in similar conduct: Joe Williams, Hunter Faulconer, Jason Rothermund, Zakary Ridener, Monika Rozalski, Kendall Turner, and Brent Bereznack. [Record No. 58, pp. 31-34; Record No. 80, pp. 1-2]  He adds three additional names in his pretext argument that he also believes are similarly situated:  Roman Sorrell, Adam Ray, and Jeremiah Terry.[6]  [Record No. 80, p. 8]

The parties dispute whether Middleton's proposed comparators engaged in substantially similar conduct without mitigating circumstances, and whether these individuals

---

[5]     The parties do not dispute that Middleton is a member of a protected class, termination is an adverse employment action, and that he was qualified for his position.

[6]     Middleton's brief includes more detail about these officers in the "factual background" section.  [*See* Record No. 58, pp. 16-17, 23.]

were subject to the same ultimate decision-makers.[7]   Several of Middleton's proposed comparators are materially dissimilar due to the nature of the conduct and disciplinary history. *See Robinson v. Quicken Loans, LLC*, No. 21-1392, 2022 WL 4234072, at \*6 (6th Cir. Sept. 14, 2022) ("Differences in experience and disciplinary history establish that [the plaintiff] and her comparators, such as they are, are not similarly situated." (citing *Tennial v. UPS, Inc.*, 840 F.3d 292, 304 (6th Cir. 2016))); *see also Simpson v. Franciscan Alliance, Inc.*, 827 F.3d 656, 662 (7th Cir. 2016) ("An employee who does not have a similar disciplinary history and performance record as the plaintiff is not similarly situated.")

In short, Middleton fails to show that eight out of ten possible comparators have a similar discipline history: Rothermund, Ridener, Rozalski, Turner, Ray, Sorrell, Faulconer, and Bereznak.[8]   "[A] plaintiff cannot establish a reasonable inference of discriminatory motive based on her 'employer's more severe treatment of more egregious circumstances.'" *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 777 (6th Cir. 2016) (quoting *Clayton v. Meijer, Inc.*, 281 F.3d 605, 612 (6th Cir. 2002)).   The two remaining potential comparators will be discussed in turn.

---

[7]      The parties do not dispute the second factor.   Middleton's "proposed comparators are all Lexington Police Department officers subject to the same standard operating procedures, general orders, disciplinary policies and investigative processes." [Record No. 80, p. 6]

[8]      Rothermund and Ridener allegedly disclosed information about a citizen on one occasion. Rozalski allegedly called a fellow officer an inappropriate name.   Bereznak was accused of placing a tracking device on his partner's vehicle but there is no evidence of additional incidents and Weathers dismissed the complaint as unfounded.   Sorrell allegedly disseminated a photo of information in the police database (similar to Middleton's second alleged infraction), but there is also no indication of additional disciplinary incidents. Additionally, Chief Weathers was not the ultimate decision-maker in disciplinary proceedings for at least three of these individuals (Ray, Faulconer, and Turner).

A citizen accused Terry of stalking, harassment, and sexual misconduct with an informant. And he later used the police database to look up information associated with a woman's license plate. Terry's conduct is similar to the underlying facts of Middleton's first disciplinary infraction. Middleton does not offer evidence of subsequent conduct such as the dissemination of information or evidence that Terry was treated more favorably than Middleton. The parties do not dispute that Assistant Chief Bryan Maynard offered Terry an option to resign during the disciplinary process, as Maynard offered Middleton. [*See* Record No. 70, p. 8 n.2.] Terry is not a viable potential comparator under the facts presented.

Williams also appears to have engaged in similar conduct, but there are key differences. Both Williams and Middleton were accused of using law enforcement resources to follow or "stalk" women. Subsequently, Williams and Middleton each allegedly disseminated information. But Williams and Middleton are materially dissimilar because Middleton's use of law enforcement resources for personal reasons was substantiated by officer statements during the investigation, and Middleton allegedly disclosed the location of fellow police officers (unlike Williams). Middleton was also subject to a different ultimate decision-maker. [Record No. 47-1, p. 20; Record No. 82, pp. 6, 8] The Sixth Circuit "has previously held that a plaintiff and a comparable employee are not similarly situated where they were disciplined by different ultimate decision-makers." *Barry*, 276 F. App'x at 481 (citing *Smith v. Leggett Wire Co.*, 220 F.3d 752, 762-63 (6th Cir. 2000)). Here, the parties do not dispute that Williams' disciplinary action predates Chief Weathers. And while Middleton contends that another individual was one of the same "key" decision-makers, he does not appear to argue

- 11 -

that someone other than the chief of police has the final decision-making authority.[9]

Middleton properly states that his showing of a *prima facie* case is not an "onerous" burden. *See Jones v. Potter*, 488 F.3d 397, 404-05 (6th Cir. 2007). But assuming *arguendo* that Middleton has established a *prima facie* case, he has failed to show pretext. *See Drews v. Berrien County*, 839 F. App'x 1010, 1012 (6th Cir. 2021) (indicating that a plaintiff "must show that 'there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry'" to survive summary judgment (quoting *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 812 (6th Cir. 2011))).[10] A plaintiff "can establish pretext if [he] can show that [his employer's] stated reason for terminating [him] (1) had no basis in fact, (2) did not actually motivate its decision, or (3) was insufficient to motivate its decision." *Drews*, 839 F. App'x at 1012 (citing *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)); *see also Williams v. Wal-Mart Stores, Inc.*, 184 S.W.3d 492, 497 (Ky. 2005) (citing *Manzer v. Diamond Shamrock Chems., Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).

Middleton argues that LFUCG's proffered reasons for terminating him did not actually motivate its decision or was insufficient to motivate its decision.[11] [Record No. 80, p. 8-9]

---

[9]    Middleton also does not offer a cat's paw argument. *See Marshall v. The Rawlings Company LLC*, 854 F.3d 368 (6th Cir. 2017). Nonetheless, there is no evidence that the chief merely "rubber-stamped" disciplinary punishments. For instance, he disagreed with the Board's more severe recommendation in Middleton's first disciplinary hearing.

[10]    LFUCG contends that its legitimate, nondiscriminatory reason for termination was Middleton's policy violations. "Several courts have recognized that violation of company policies is a legitimate, nondiscriminatory reason for terminating an employee." *Day v. Sears Holdings Corp.*, 930 F.Supp.2d 1146, 1170 (C.D. Cal. 2013) (collecting cases).

[11]    It is unclear whether Middleton also argues that LFUCG's reason has no basis in fact. Middleton states in his Response that "[e]vidence in the case confirms that false allegations into Jervis's conduct were reported all the way up the ladder," and "[f]alse allegations against him became the subject of roll calls, officer gossip, and discussions between supervisors and

His Response alleged that the document placing Middleton on administrative leave was made one day before police executed a search warrant on Sarah Williams' social media account. LFUCG responded by citing Middleton's Response exhibit 25, showing that there was an earlier warrant to access Williams' phone which contained Middleton's messages to Williams. Middleton does not dispute this in his sur-reply.   Instead, he contends that his potential comparators are "substantially identical" to Middleton, but were treated more favorably and that Middleton's "fate was sealed well before any communications between he and the activist were seen . . ."

"Absent direct evidence of pretext, [a plaintiff] can survive summary judgment with circumstantial evidence in numerous forms, to include . . . discriminatory treatment when compared to similarly situated employees." *Ellis v. Buzzi Unicem USA*, 293 F. App'x 365, 372 (6th Cir. 2008) (internal quotation marks and citation omitted).   Middleton's potential comparators, however, are not similarly situated for the reasons stated above.   Middleton's final pretext argument is that LFUCG's proffered reason for Middleton's termination was not its actual motivation.   He contends that "his fate was sealed" before LFUCG had evidence of his communications with Sarah Williams.   The only evidence Middleton offers is a deposition indicating that general discussions or rumors among unknown lower-level officers began before the execution of the Sarah Williams search warrant.   The rumors regarded the social media posts Middleton "liked" and whether he gave information "that was allowing the [protesting] group or at least the individuals to be more volatile and hostile." [Record No. 80-

---

their units."   Middleton did not make a counterargument against LFUCG's "honest belief" contention even if he asserts that LFUCG's reason has no basis in fact. *See Rafee v. Volvo Grp. N. Am., LLC*, No. 21-5891, 2022 U.S. App. LEXIS 15388, at *8 (6th Cir. June 3, 2022).

1] These comments could not allow a reasonable jury to conclude that LFUCG's stated reason

for terminating Middleton was a pretext. "Actions by nondecisionmakers cannot alone prove

pretext." *EEOC v. Ford Motor Co.*, 782 F.3d 753, 768 (6th Cir. 2015) (en banc) (citing *Bush*

*v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998)); *see also Drews v. Berrien County*,

839 F. App'x 1010, 1015 n.4 (6th Cir. 2021) (collecting cases).[12]

## 2. Disparate Impact

"[D]isparate impact theory requires a plaintiff to demonstrate that a facially neutral

employment practice falls more harshly on one group than another and that the practice is not

justified by business necessity." *Dunlap v. Tennessee Valley Authority*, 519 F.3d 626, 629 (6th

Cir. 2008) (citing *Rowe v. Cleveland Pneumatic Co.,* 690 F.2d 88, 92 (6th Cir. 1982)); *see also*

*Louisville-Jefferson County Metro Gov't v. Martin*, No. 2007-CA-001629, 2009 Ky. App.

Unpub. LEXIS 387, at *17-18 (Ky. Ct. App. June 12, 2009). "[A] prima facie case is

established when: (1) plaintiff identifies a specific employment practice to be challenged; and

(2) through relevant statistical analysis proves that the challenged practice has an adverse

impact on a protected group." *Johnson v. United States Dep't of Health and Human Servs.*,

30 F.3d 45, 48 (6th Cir. 1994).

Middleton has not developed an argument under this theory in his briefs and has not

pointed to a specific employment practice that harms one group more than another. A plaintiff

must come forward with evidence to support his claim once he is challenged on a motion for

---

[12]     LFUCG argues that the "sheer weight of the circumstantial evidence" must support a finding of race discrimination under this pretext factor for the plaintiff to survive summary judgment. The Sixth Circuit has clarified that this phrase simply "refer[s] to the plaintiff's ultimate strategy at trial," and not what is required at this stage. *See George v. Youngstown State University*, 966 F.3d 446, 463 (6th Cir. 2020).

summary judgment. He cannot rely upon his complaint. *See McCowan v. City of Philadelphia*, No. 19-3326, 2022 WL 1557779, at *15-16 (E. D. Pa. May 17, 2022) (collecting cases).

### C.  Hostile Work Environment, Retaliation, and Breach of Contract

Middleton next argues that he was subjected to a race-based hostile work environment. [*See* Record No. 1-1, 58.]  "The *McDonnell Douglas* burden-shifting approach also applies to hostile-work-environment claims."  *Clay v. UPS, Inc.*, 501 F.3d 695, 706 (6th Cir. 2007).  A plaintiff must show that: "(1) [he] is a member of a protected class; (2) [he] was subjected to unwelcomed racial harassment; (3) the harassment was race based; (4) the harassment unreasonably interfered with [his] work performance by creating an environment that was intimidating, hostile, or offensive; and (5) employer liability.  *Id.* (citing *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999)).  Middleton and LFUCG entered into a settlement on October 24, 2019, discharging LFUCG of "any claim" that Middleton could have brought up until that date.  *Cf.  Goode v. N.J. Dep't of Corr.*, No. 11-cv-069602015, U.S. Dist. LEXIS 55088, at *19-20 (D. N.J. April 28, 2015).  LFUCG contends that "[a]ll of the incidents that Middleton identifies as part of his hostile work environment claim predate the union grievance alleging race discrimination that was filed in connection with his first disciplinary proceeding." [Record No. 70, p. 15] Middleton does not refute this in his sur-reply and his deposition supports this determination.  [*See* Record No. 80, pp. 9-10; Record No. 54-7, pp. 65-67.]

Middleton's amended complaint also contains allegations of retaliation in violation of KY. REV. STAT. §344.280 and breach of contract against LFUCG.  Middleton does not develop either of these issues in his Response. [Record No. 58], or sur-reply [Record No. 80, p. 10]. Where a party "mention[s] a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones," the Court may deem that argument waived. *McPherson v. Kelsey*,

125 F.3d 989, 995-96 (6th Cir. 1997) (internal quotation marks omitted).  Thus, these

arguments are waived based on the plaintiff's failure to develop them.

### D.  First Amendment Free Speech Retaliation

Middleton next alleges that Weathers discharged him in retaliation for his exercise of

constitutionally protected speech.  [Record No. 58, 80]  To establish a prima facie case for free

speech retaliation, a plaintiff must show that: "(1) he engaged in constitutionally protected

speech or conduct; (2) an adverse action was taken against him that would deter a person of

ordinary firmness from continuing to engage in that conduct"; and "(3) there is a causal

connection between elements one and two—that is, the adverse action was motivated at least

in part by his protected conduct."  *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250,

255 (6th Cir. 2006).  "If the employee establishes a prima facie case, the burden then shifts to

the employer to demonstrate 'by a preponderance of the evidence that the employment decision

would have been the same absent the protected conduct.'"  *Dixon v. University of Toledo*, 702

F.3d 269, 274 (6th Cir. 2012) (quoting *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 208

(6th Cir.2010)).  The defendants argue that Middleton did not engage in constitutionally

protected speech and the decision to terminate him would have been the same absent the

alleged protected conduct.  The defendants also assert that Weathers is shielded by qualified

immunity.  [Record No. 47-1, 70, 82]

"To defeat a claim of qualified immunity, the plaintiff must show that the official's

conduct (1) violated a constitutional right that (2) was clearly established."  *Hart v. Hillsdale*

*Cnty.*, 973 F.3d 627, 635 (6th Cir. 2020) (citing *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887,

897 (6th Cir. 2019)).  "Government officials performing discretionary functions generally are

shielded from liability for civil damages[13] insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982).  The parties do not dispute that Weathers performed a discretionary function when he terminated Middleton's employment.  The issues concern whether terminating Middleton violated his right to free speech and whether that right was clearly established when he was fired.

Middleton states in his sur-reply that his right was clearly established because "all public officials have been charged with knowing that public employees may not be disciplined for engaging in speech on matters of public concern."  [Record No. 80 (quoting *Myers v. City of Centerville*, 41 F.4th 746, 766 (6th Cir. 2022)]  But this "does not settle the matter," even if this is true.  *Lane v. Franks*, 573 U.S. 228, 242 (2014) ("A public employee's [speech] is not categorically entitled to First Amendment protection simply because it is speech as a citizen on a matter of public concern.").  The law also requires a balancing determination under *Pickering v. Board of Education*, 391 U.S. 563 (1968), and Middleton does not appear to address how the outcome of the *Pickering* balancing test was clearly established at the time Middleton's employment was terminated.  [*See id.* at 14-15.]

The *Pickering* balancing test involves determining "if the employee's free speech interests outweigh the efficiency interests of the government as employer." *Rose v. Stephens*, 291 F.3d 917, 920 (6th Cir. 2002).  The investigative report submitted to Weathers before he terminated Middleton's employment states that "Officer Middleton sent Ms. Williams a

---

[13] Middleton's amended complaint indicates that he "seeks compensatory and punitive damages from the Defendant Weathers due to its actions in depriving him of his constitutional right to free speech."  [*See* Record No. 1-1, p. 264.]

screenshot of his phone and the ERU Callout Text for a Civil Disturbance downtown." [Record No. 58-30] The ERU stands for " Emergency Response Unit which is a specialized unit that often deals with sensitive information." [*Id.*]

The parties do not dispute that the screenshot depicted a confidential message, indicating where ERU members would convene the night of ongoing protests and in response to civil disturbance.[14] Middleton has not identified any authority indicating that sharing a confidential police communication indicating the future location of officers is a protected right, and certainly not one that is clearly established. *Cf. Daunt v. Benson*, 956 F.3d 396, 419 (6th Cir. 2020) (indicating justification for limiting city commissioners' speech in part because "[t]he potential for commissioners, while speaking in their private capacities, to disclose 'sensitive, confidential, or privileged information,' . . . supports the state's interest in closely regulating the speech of these commissioners" (quoting *Lane*, 573 U.S. at 242)).

Middleton also has not indicated how the *Pickering* balancing test would be clearly established regarding his other communications. "The Sixth Circuit thoroughly addressed whether an employee's First Amendment right to be free of retaliation is clearly established . . . in free speech cases, the employee's right to speak must be 'so clear at the time in question that reasonable minds could not differ on the constitutionality.'" *Napier v. Breathitt County Bd. of Educ.*, No. 12-370, 2014 U.S.

---

[14]      Instead, Middleton states that "[t]he message literally said that ERU was to respond. It gives no address. No details. No names. It is a generalized message advising ERU members to convene." [Record No. 80, p. 7]

Dist. LEXIS 92120, at *21 (July 8, 2014) (citing *Williams v. Kentucky*, 24 F.3d 1526, 1533-38 (6th Cir. 1994)).  Defendant Weathers is entitled to the protections of qualified immunity for these reasons.

**IV.**

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** as follows:

1.      The defendants' motion for summary judgment with respect to all claims in the plaintiff's amended complaint [Record No. 47] is **GRANTED**.

2.      The plaintiff's claims are **DISMISSED** with prejudice and **STRICKEN** from the docket.

Dated: November 28, 2022.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky